**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

|  |  |
|---|---|
| JOHN D. SHILLING,<br><br>       Plaintiff,<br><br>      v.<br><br>POLYONE CORPORATION,<br><br>       Defendant. | Case No.  14-cv-03562-BLF<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>[Re:  ECF 93] |

By this motion for partial summary judgment, Defendant PolyOne Corporation ("PolyOne") seeks to define the Majority Shareholder's indemnity obligations under the Share Purchase Agreement ("SPA").  In 2012, PolyOne and Glasforms, Inc. ("Glasforms") entered into the SPA for PolyOne to purchase all the outstanding shares of Glasforms.  Days before the expiration of the warranty period set forth in the SPA, PolyOne asserted over $40 million of indemnification claims against Plaintiff John D. Shilling, Trustee of the Peter Pfaff Revocable Trust ("Shilling").  Immediately after receiving the claims, Shilling filed this declaratory relief action, asking for a judicial determination of the parties' rights and obligations under the SPA, alleging PolyOne breached the implied covenant of good faith and fair dealing, and seeking indemnification for the assertion of its rights.  Compl. ¶¶ 16-27, ECF 1.  PolyOne counter-claimed for breach of the purchase agreement, indemnification for losses resulting from that breach, and declaratory relief.  Second Amended Cross-Complaint ("SACC") ¶¶ 17-29, ECF 73.  Before the Court is PolyOne's motion seeking partial summary judgment (1) that the "Cap" in section 9.4(b) of the SPA does not limit the Majority Shareholder's obligations in regard to the indemnity claims asserted by PolyOne, and (2) that Shilling is obligated to defend and indemnify PolyOne against the pending lawsuit against Glasforms and PolyOne, entitled *Total Rod Concepts, Inc. v.*

United States District Court
Northern District of California

*Glasforms, Inc. et al.*, Case No. 14-05-05365, in the District Court of Montgomery County Texas.

Mot. 2, ECF 93.  The Court, having considered the briefing submitted by the parties and the oral

argument presented at the hearing on October 27, 2016, GRANTS IN PART and DENIES IN

PART PolyOne's motion for partial summary judgment.

## I.   STATEMENT OF UNDISPUTED FACTS

### A.   Factual Background

From the parties' briefing, evidence, and statement of facts, the following facts relevant to

the pending motion are undisputed unless otherwise noted.  Peter Pfaff started Glasforms in 1978

and was its majority shareholder until December 19, 2012.  Johnson Decl., Ex. A ("Compl.") ¶ 6.

On that date, Mr. Pfaff and other Glasforms shareholders agreed to sell 91.99% of the outstanding

shares of Glasforms to PolyOne for $32.68 million pursuant to a Share Purchase Agreement.

Johnson Decl., Ex. B ("SPA").  The SPA contains representations and warranties relating to the

shareholders, *id*. at 17-18 ("Article IV"), to Glasforms, *id*. at 19-43 ("Article V"), and

representations and warranties of the purchaser, *id*. at 43-44 ("Article VI").  The SPA also sets

forth indemnification obligations in section 9.2 and indemnification limitations in section 9.4 of

Article IX.  *Id*. at 48-54.  Section 9.2, entitled "Indemnification," states that:

> (a)      Subject to Sections 9.1, 9.4 and 9.6 hereof, the Majority Shareholder
> hereby jointly and severally (except with respect to Section 9.2(a)(i)), and the
> ESOP and Minority Shareholders severally, but not jointly, agree to indemnify
> and hold Purchaser, the Company, and their respective directors, officers,
> employees, Affiliates, shareholders, agents, attorneys, representatives, successors
> and assigns (collectively, the "Purchaser Indemnified Parties") harmless from and
> against, and pay to the applicable Purchaser Indemnified Parties the amount of,
> any and all losses, liabilities, claims, obligations, deficiencies, demands,
> judgments, damages, interest, fines, penalties, claims, suits, actions, causes of
> action, assessments, awards, costs and expenses (including costs of investigation
> and defense and attorneys' and other professionals' fees), or any diminution in
> value, whether or not involving a third party claim (individually, a "Loss" and,
> collectively, "Losses"):
>
> > (i)  based upon, attributable to or resulting from the failure of any of the
> > representations or warranties in Article IV of this Agreement to be true and
> > correct as of the date hereof;

(ii) based upon, attributable to or resulting from the failure of any of the representations and warranties in Article V of this Agreement to be true and correct as of the date hereof;

(iii) based upon, attributable to or resulting from the breach of any covenant or other agreement on the part of the Shareholders under this Agreement;

(iv) attributable to or resulting from any Indebtedness or Company Transaction Expenses not fully paid prior to the Closing or not included in the computation of the Purchase Price;

(v) arising out of, attributable to or resulting from any Legal Proceeding arising solely out of the operation of the Company and events occurring prior to the Closing Date, whether known or unknown as of the date hereof; and

(vi) based upon, attributable to or resulting from (A) all Taxes (or the nonpayment thereof) of the Company and its Subsidiary for any Pre-Closing Tax Period and any Pre-Closing Straddle Period; (B) all Taxes of any member of an affiliated, combined or unitary group of which the Company or its Subsidiary is or was a member on or prior to the Closing Date, including pursuant to Treasury Regulation Section 1.1502-6 or any analogous or similar state, local or foreign Law; (C) any and all Taxes of any Person (other than the Company or its Subsidiary) imposed on the Company or its Subsidiary as a transferee or successor, by contract or pursuant to any Law, which Taxes relate to an event or transaction occurring on or before the Closing Date; and (D) all Taxes (or the nonpayment thereof) of Glasforms Exports, Ltd.

(b) Subject to Sections 9.1 and 9.4, Purchaser hereby agrees to indemnify and hold the Shareholders and their respective Affiliates, shareholders, agents, attorneys, representatives, successors and permitted assigns (collectively, the "Shareholder Indemnified Parties") harmless from and against, and pay to the applicable Shareholder Indemnified Parties the amount of any and all Losses:

(i) based upon, attributable to or resulting from the failure of any of the representations or warranties made by Purchaser in this Agreement or in any Ancillary Agreement to be true and correct at the date hereof; and

(ii) based upon, attributable to or resulting from the breach of any covenant or other agreement on the part of Purchaser under this Agreement or any Ancillary Agreement.

*Id*. at 49-50.

To secure the potential indemnification obligations to PolyOne, the parties entered into an Escrow Agreement, where $5 million of Mr. Pfaff's proceeds from the sale was placed into escrow.  *Id*. at 53 (describing Escrow Agreement and arrangement under section 9.5, entitled "Indemnity Escrow"); Johnson Decl., Ex. A ("Compl.") ¶ 8.

1    Section 9.4(b) under Article IX of the SPA then sets forth how the amount of

2    indemnification may be limited:

3        9.4 Limitations on Indemnification.
         …
4        (b) The Minority Shareholders and the ESOP shall not be required to indemnify
         any Purchaser Indemnified Party for an aggregate amount of Losses exceeding the
5        Indemnity Escrow Amount (the "Cap"); provided that the Cap shall not apply to
         indemnification obligations of the Majority Shareholder with respect to Losses
6        related to the failure to be true and correct of any of the representations or
         warranties contained in Sections 5.1 (Organization), 5.2 (Authorization), 5.4
7        (Capitalization), 5.5 (Subsidiaries), 5.10 (Taxes), 5.15 (Employee Benefit Plans),
         5.19 (Environmental) and 5.31 (Financial Advisors) of this Agreement (the
8        "Fundamental Reps"). The Majority Shareholder shall not be required to
         indemnify any Purchaser Indemnified Party for an aggregate amount of Losses
9        exceeding the pro rata portion of the Purchase Price received by the Majority
         Shareholder as set forth on Schedule 5.4(a) under Section 9.2(a)(ii) in connection
10       with any Losses related to the failure to be true and correct of any of the
         Fundamental Reps or under Sections 9.2(a)(i), 9.2(a)(iii), 9.2(a)(iv), 9.2(a)(v) or
11       9.2(a)(vi). For the avoidance of doubt, to the extent the Minority Shareholders or
         the ESOP would be required to indemnify any Purchaser Indemnified Party under
12       Section 9.2(a) but for the limitations set forth above for an aggregate amount of
         Losses in excess of the Cap, such indemnification obligations shall be borne by
13       the Majority Shareholder in accordance with the limitations set forth in the
         preceding sentence.
14

15   *Id.* at 52.

16       The SPA requires, and both parties agree, that Delaware law is the governing choice of

17   law.  *Id.* at 55 (§10.4); Mot. 3; Opp. 9 *et seq*.

18       On June 17, 2014, two days before the expiration of the SPA's eighteen month warranty

19   period, PolyOne asserted various indemnification claims totaling over $40 million. Mot. 2, 14-15;

20   Opp. 2.  On June 25, 2014, Shilling accepted the tender of the TRC lawsuit indemnity claims, only

21   to withdraw it later.  Johnson Decl., Exs. L, M, N, and O.  Many of the indemnity claims were

22   later dismissed pursuant to a joint stipulation.  ECF 70.  Out of the remaining claims, those

23   relevant to this motion pertains to PolyOne's indemnification claims tendered under (i) section

24   5.14 of the SPA, entitled "Material Contracts"; and (ii) Section 5.24 of the SPA, entitled

25   "Customers and Suppliers."  Mot. 2; 14-15; Opp. 7.  PolyOne's asserted indemnification claims

26   stem from PolyOne's belief that Glasforms knew but failed to disclose its business with certain

27   customers, including a confidentiality agreement between Glasforms and Total Rod Concepts, Inc.

28

4

1    ("TRC").  Johnson Decl., Ex. J (TRC Compl.); Mot. 6.  The parties do not dispute that sections

2    5.14 and 5.24 of the SPA are not designated as "Fundamental Reps" under Section 9.4(b).  Mot.

3    13; Opp. 7.

4         Nine days later, on June 26, 2014, Shilling filed the instant lawsuit seeking declaratory

5    relief, alleging that PolyOne breached the implied covenant of good faith and fair dealing, and

6    seeking indemnity for Shilling's expenses, costs, attorneys' fees, and other damages Shilling may

7    incur as a result of PolyOne's actions.  Compl. ¶¶ 16-27, ECF 1.

8         In response, PolyOne filed a cross complaint, alleging breach of the SPA and seeking

9    indemnification for this and the TRC lawsuits.  SACC, ECF 73.  Shilling has previously moved

10   for summary judgment on whether PolyOne is entitled to indemnity for losses and defense of the

11   present action, which is not relevant to the motion here, so the Court will not discuss it here except

12   to say that the motion was granted in part and denied in part.  ECF 75, 88.

13        **B.    Shilling's Evidentiary Objections**

14        Shilling objects to facts and evidence in PolyOne's Reply in support of this current motion

15   that were not presented in its motion for partial summary judgment.  Obj. to Reply, ECF 100.

16   Specifically, Shilling objects to the references to (i) sales that were "far less than Glasforms had

17   stated they would be"; and (ii) the expert witness reports of Dr. Barbara Luna; (iii) the expert

18   witness testimony of Eric Nath; and (iv) the expert witness report of James Turner.  *Id.* at 2.

19   These references appear in PolyOne's "Response to [Shilling's] Statement of the Case" and are

20   used to support PolyOne's allegation relating to the amount of damages it has suffered for which

21   Shilling is liable.  Reply 2, ECF 99.  Shilling objects to the introduction of these facts and

22   evidence for the first time in PolyOne's Reply and urges the Court to disregard them.  Obj. to

23   Reply 2 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894-95 (1990)).  Shilling further

24   argues that the expert report of James Turner was cited without proper context to support the

25   alleged loss of $5.6 million.  Obj. to Reply 2.

26        The Court SUSTAINS Shilling's objections and will not consider any of the

27   aforementioned references in PolyOne's Reply.  Because these facts and evidence were not

28   presented in PolyOne's motion and were only advanced for the first time in the reply brief, the

United States District Court
Northern District of California

United States District Court
Northern District of California

Court will not consider them in ruling on PolyOne's motion.  *E.g.*, *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.")

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  "Partial summary judgment that falls short of a final determination, even of a single claim, is authorized by Rule 56 in order to limit the issues to be tried." *State Farm Fire & Cas. Co. v. Geary,* 699 F. Supp. 756, 759 (N.D. Cal. 1987) (citing *Lies v. Farrell Lines, Inc.,* 641 F.2d 765, 769 n.3 (9th Cir.1981)).

The moving party "bears the burden of showing there is no material factual dispute," *Hill v. R+L Carriers, Inc.,* 690 F. Supp. 2d 1001, 1004 (N.D. Cal. 2010), by "identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987).  In judging evidence at the summary judgment stage, "the Court does not make credibility determinations or weigh conflicting evidence, and is required to draw all inferences in a light most favorable to the nonmoving party." *First Pac. Networks, Inc. v. Atl. Mut. Ins. Co.,* 891 F. Supp. 510, 513-14 (N.D. Cal. 1995).  For a court to find that a genuine dispute of material fact exists, "there must be enough doubt for a reasonable trier of fact to find for the [non-moving party]." *Corales v. Bennett,* 567 F.3d 554, 562 (9th Cir. 2009).

## III.   DISCUSSION

### A.    The $5 Million Cap as a Limit

PolyOne argues that when section 9.4(b) of the SPA is read as a whole, the Majority Shareholder's monetary exposure has no limit except for the Fundamental Reps. Mot. 13. PolyOne also contends that section 9.4(b) only caps the Minority Shareholders and ESOP's monetary exposure at the $5 million indemnity escrow cap, and the Majority Shareholder's

1   monetary exposure for the Fundamental Reps by the Pro Rata Proceeds Limitation.  *Id.*  According

2   to PolyOne, aside from the Fundamental Reps and certain 9.2(a) subsections, the Majority

3   Shareholder's indemnity obligations with respect to the representations and warranties are not

4   subject to any limit.  *Id.* at 12-13.  PolyOne further argues that a contrary interpretation that caps

5   Majority Shareholder's indemnity obligations at $5 million would render the last sentence of

6   section 9.4(b) superfluous.  *Id.* at 14.

7       In opposition, Shilling contends that section 9.4(b) subjects all claims relating to Article V

8   representations to the cap except for Fundamental Reps, and the Fundamental Reps do not include

9   PolyOne's indemnification claims under sections 5.14 and 5.24.  Opp. 3, 9.  Specifically, Shilling

10  argues that because section 9.4(b) explicitly enumerates items not subject to the $5 million Cap,

11  i.e., the Fundamental Reps, what is not enumerated would have to be subject to the cap.  Opp. 11

12  (citing Arthur L. Corbin, 3 Corbin on Contracts § 552 at 206 (1960) ("if several subjects of a

13  larger class are specifically enumerated, . . . it may reasonably be inferred that the subjects not

14  specifically named were intended to be excluded")).  According to Shilling, PolyOne's

15  interpretation that certain of Majority Shareholder's obligations are uncapped would render the

16  phrase enumerating the Fundamental Reps superfluous.  Opp. 11.

17      The parties do not dispute that the Delaware choice of law provision in the SPA governs

18  this dispute so the Court will apply Delaware's principles of contract interpretation.  SPA, §10.4;

19  Mot. 3; Opp. 9 *et seq.*  Under Delaware law, "[t]he proper construction of any contract … is purely

20  a question of law."  *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192,

21  1195 (Del. 1992).  "Clear and unambiguous language … should be given its ordinary and usual

22  meaning."  *Id.* at p. 1195-96.  Delaware employs an "objective person" test to determine whether a

23  contract is ambiguous:

24      A contract is not rendered ambiguous simply because the parties do not agree upon
        its proper construction.  Rather, a contract is ambiguous only when the provisions
25      in controversy are reasonably or fairly susceptible of different interpretations or
        may have two or more different meanings.  Ambiguity does not exist where the
26      court can determine the meaning of a contract without any other guide than a
        knowledge of the simple facts on which, from the nature of language in general, its
        meaning depends.  Courts will not torture contractual terms to impart ambiguity
27      where ordinary meaning leaves no room for uncertainty.  The true test is not what
        the parties to the contract intended it to mean, but what a reasonable person in the
28      position of the parties would have thought it meant.

7

*Id.* at 1196 (citations and quotations marks omitted).

If a contract is "clear and unambiguous on its face," a court may not consult extrinsic evidence to aid in interpreting its provisions or to vary the terms of the contract or to create an ambiguity. *Pellaton v. Bank of New York*, 592 A.2d 473, 478 (Del. 1991); *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232–33 (Del. 1997). "Only where there are ambiguities may a court look to collateral circumstances; otherwise, only the language of the contract itself is considered in determining the intentions of the parties." *Majkowski v. Am. Imaging Mgmt. Servs.*, LLC, 913 A.2d 572, 581 (Del. Ch. 2006); *Eagle*, 702 A.2d at 1232.

Here, the Court finds that the language of section 9.4(b) of the SPA is not ambiguous. Article IX of the SPA provides important context. SPA 48-54. The Court first notes that section 9.2 of Article IX sets forth the parties' respective obligations regarding "Indemnification," without setting any limitations to the amount that might be owed. *Id.* at 49-50. Subsection 9.2(a)(ii) specifically provides that failure of representations or warranties of Article V is grounds for indemnification. Certain of those representations and warranties are considered "Fundamental Reps" which are listed in section 9.4(b). Section 9.4(b), the provision at issue this motion, provides for certain express "Limitations on Indemnity." *Id.* at 52-53. The Court now analyzes section 9.4(b) sentence by sentence below.

The first sentence of section 9.4(b) contains two clauses. *Id.* at 52. The first clause of the first sentence of section 9.4(b) limits the monetary exposure of the Minority Shareholders and the ESOP to the amount of the indemnity escrow amount ($5 Million), which is defined as the "Cap." *Id.* As such, the term "Cap" refers to the $5 million placed in the indemnity escrow as defined in section 9.5. *Id.* at 53. The second clause of the first sentence provides that the $5 million Cap does not apply to the indemnification obligations of the Majority Shareholder with regard to the "Fundamental Reps," which consists of the representations or warranties contained in Sections 5.1 (Organization), 5.2 (Authorization), 5.4 (Capitalization), 5.5 (Subsidiaries), 5.10 (Taxes), 5.15 (Employee Benefit Plans), 5.19 (Environmental) and 5.31 (Financial Advisors). This first sentence is silent as to whether there is any limit on the Majority Shareholder's indemnity obligation with respect to the remaining representations and warranties under subsection 9.2(a)(ii),

1   which the Court refers to as the "non-Fundamental Reps."

2         The second sentence of section 9.4(b) limits the Majority Shareholder's indemnity

3   exposure for certain enumerated losses.  Specifically, the Majority Shareholder's indemnity

4   obligation is limited to "the pro rata portion of the Purchase Price received by the Majority

5   Shareholder" for Losses arising from the Fundamental Reps, or under Sections 9.2(a)(i),

6   9.2(a)(iii), 9.2(a)(iv), 9.2(a)(v) or 9.2(a)(vi) of the SPA.

7         The third sentence of section 9.4(b) provides:
      For the avoidance of doubt, to the extent the Minority Shareholders or the ESOP
8     would be required to indemnify any Purchaser Indemnified Party under Section
      9.2(a) but for the limitations set forth above for an aggregate amount of Losses in
9     excess of the Cap, such indemnification obligations shall be borne by the Majority
      Shareholder in accordance with the limitations set forth in the preceding sentence.
10

11        The third sentence provides that the Majority Shareholder is broadly responsible for all of

12   the sellers' indemnity obligations "under section 9.2(a)" whenever the aggregate amount of Losses

13   is "in excess of the Cap."  Moreover, in accordance with this third sentence, the Majority

14   Shareholder's indemnity obligation in that circumstance shall be "in accordance with the

15   limitations set forth in the preceding sentence," i.e. the second sentence.  The Majority

16   Shareholder's obligation as to section 9.2(a) is thus limited by the second ("preceding") sentence

17   of section 9.4(b) – "the pro rata portion of the Purchase Price" for Fundamental Reps and certain

18   9.2(a) subsections.

19        Read as a whole, section 9.4(b) provides that (1) the Minority Shareholders and the

20   ESOP's monetary exposure is capped at the $5 million indemnity escrow amount, but this Cap

21   does not apply to Majority Shareholder's losses relating to Fundamental Reps; (2) the Majority

22   Shareholder's monetary exposure for the Fundamental Reps and for sections 9.2(a)(i), 9.2(a)(iii),

23   9.2(a)(iv), 9.2(a)(v) or 9.2(a)(vi) is limited by the Pro Rata Proceeds Limitation, and (3) the

24   Majority Shareholder shall pay Minority Shareholders or the ESOP's obligations that are in excess

25   of the $5 million Cap, limited in accordance with the second sentence of section 9.4(b).

26        Accordingly, the only explicit statement on Majority Shareholder's obligation and the $5

27   million Cap is for losses in connection with the Fundamental Reps in the second clause of the first

28   sentence.  Whether the Cap applies to the non-Fundamental Reps, section 9.4(b) is silent.

United States District Court
Northern District of California

9

United States District Court
Northern District of California

However, the provision explicitly states that limitations on the Majority Shareholder's indemnity obligation are governed by the second sentence of section 9.4(b).  Since the second sentence is silent on the $5 million Cap, the Court concludes that the $5 million Cap does not apply to the Majority Shareholder's indemnity obligations for the non-Fundamental Reps, based on the ordinary and usual meaning from the perspective of a reasonable person in the parties' position.

The Court agrees with PolyOne that a contrary interpretation would render as surplusage the third sentence of section 9.4(b).  *NAMA Holdings, LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007) ("Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court.").  If the Court were to infer from the second clause of the first sentence that the $5 million Cap applies to Majority Shareholder's obligations for non-Fundamental Reps, then the Court would be unable to find any meaning in the third sentence, which refers to the second sentence for limitations on the Majority Shareholder's obligations.

In its opposition, Shilling relies on the principle of contract interpretation that it is reasonable to infer that subjects not specifically named were intended to be excluded.  3 Corbin on Contracts § 552 at 206 ("if several subjects of a larger class are specifically enumerated, . . . it may reasonably be inferred that the subjects not specifically named were intended to be excluded").  Based on this principle, the second clause of the first sentence could imply that the Cap applies to non-Fundamental Reps because it only enumerates the Fundamental Reps to be excluded from the Cap.  If this inference is not made, Shilling argues that the second clause of the first sentence enumerating the Fundamental Reps would be superfluous.  Opp. 11.

The Court finds this inference ungrounded.  "It is not the proper role of a court to rewrite or supply omitted provisions to a written agreement."  *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998).  "In cases where obligations can be understood from the text of a written agreement but have nevertheless been omitted in the literal sense, a court's inquiry should focus on 'what the parties likely would have done if they had considered the issue involved.'"  *Id.*  In light of the limitations on Majority Shareholder's indemnity obligations explicitly stated in the second and third sentences, it is improbable that the

United States District Court
Northern District of California

1  parties intended to leave additional limits unstated and only implicitly inferred from the first

2  sentence.  Shilling also cites *iBio, Inc. v. Fraunhofer USA, Inc.*, in support of his interpretation of

3  section 9.4(b), but *iBio* does not compel a different conclusion.  No. 10256, 2016 WL 4059257, at

4  *6 (Del. Ch. July 29, 2016).  In *iBio*, the court found that the plaintiff iBio was not entitled to

5  "Intellectual Property Rights" under the unamended technology transfer agreement because

6  "Intellectual Property Rights," despite being defined in the agreement, was not included among a

7  list of enumerated rights to which iBio had a right.  *Id.*  The issue in *iBio* thus relates to a list of

8  enumerated rights that is to be affirmatively granted to a plaintiff, which is a different factual

9  circumstance from the present case.  The provisions in *iBio* were also not drafted or organized in

10  the same way as section 9.4(b).  Regardless, it is notable that *iBio* focused on the subsection

11  explicitly listing the rights as dispositive over another from which additional rights to the plaintiff

12  might be inferred.  *Id.* (finding that the section of the agreement obligating the defendant to protect

13  its "Intellectual Property Rights" failed to imply that "Intellectual Property Rights" should be

14  added to the list of rights owned by the plaintiff).  In the same manner, the recitation of explicit

15  obligations and limitations on Majority Shareholder as set forth in the second and third sentences

16  persuades the Court that additional limitations should not be inferred, if not explicitly stated.

17       Although the Court finds that section 9.4(b) is clear and unambiguous and that the Court

18  need not resort to extrinsic evidence, Shilling has provided drafts of the SPA for the Court's

19  consideration.  Crosby Decl., Exs. B-G.  Both parties have relied on the drafts in their arguments

20  and neither objects to the introduction of these drafts for consideration under this motion for

21  partial summary judgment.  However, even if the SPA drafts were considered, the Court's

22  determination as to its interpretation of section 9.4(b) remains unchanged.[1]  In reviewing the

23  drafts, the Court observes that the limitations on the Majority Shareholder's indemnification

24  obligations evolved over different versions of the drafts.  In the fourth draft, dated December 13,

25

26  [1] Where there is uncertainty in the meaning and application of contract language, the reviewing court must consider the evidence offered in order to arrive at a proper interpretation of contractual

27  terms. *Eagle*, 702 A.2d at 1232-33.  This task may be accomplished by the summary judgment procedure in certain cases where the moving party's record is not *prima facie* rebutted so as to

28  create issues of material fact.  *Id.* at 1233; *GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 784 (Del. 2012).

United States District Court
Northern District of California

2012, section 9.4(b) states the following with respect to the obligations of the Majority Shareholders – "The Majority Shareholder shall not be required to indemnify . . . under Section 9.2(a)(ii) . . . for amount of losses exceeding the [Escrow Amount]," provided that the Escrow Amount does not apply to the Fundamental Reps. Crosby Decl., Exs. E and F. In the subsequent draft dated December 19, 2012, a draft immediately preceding the final version, this language limiting the Majority Shareholder's obligation under Section 9.2(a)(ii) by the escrow amount was deleted. Crosby Decl., Ex. G. Accordingly, the precise limitation that Shilling urges this Court to infer – having the escrow amount as a cap on the Majority Shareholder's obligation – was explicitly set forth in a prior draft but later removed from the final draft. This is consistent with the Court's interpretation of the contractual term that the $5 million Cap does not apply, as discussed above. The Court will not resupply a contractual term that Shilling failed to secure at the bargaining table. *Nationwide Emerging Managers, LLC v. Northpointe Holdings, LLC*, 112 A.3d 878, 898 (Del. 2015) (refusing to apply an implied term that a party sought to apply because it was "lost at the bargaining table") (citing *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 707 (Del. Ch. 2004)).

Accordingly, the Court finds that section 9.4(b) of the SPA does not impose the Indemnity Escrow Amount of $5 million as a Cap on the Majority Shareholder's indemnity obligation for the non-Fundament Reps under section 9.2(a)(ii).

**B.     PolyOne's Indemnity Against the *TRC Lawsuit***

PolyOne claims that the representations and warranties under sections 5.14(a)(viii) and 5.14(b) of the SPA were not true and correct and on that basis, seeks indemnification for its TRC lawsuit under section 9.2(a)(ii) of the SPA, which provides for indemnification of losses "based upon, attributable to, or resulting from the failure of any of the representations or warranties in Article V of the [SPA] to be true and correct as of the date hereof." Mot. 16, 19; SPA 49. According to PolyOne, Glasforms and TRC entered into a Confidentiality Agreement as part of the agreement to manufacture TRC's fiberglass sucker rod bodies, which Glasforms later violated by selling the same rod bodies to another company named Flexrod. Mot. 7-8, 16. PolyOne claims

United States District Court
Northern District of California

1    that Glasforms failed to disclose this Confidentiality Agreement in the Disclosure Schedule

2    5.14(a) or any events that suggest that Glasforms had breached the Confidentiality Agreement

3    under section 5.14(b).  *Id.* at 16; Johnson Decl., Ex. C.  PolyOne thus contends that this failure is a

4    breach of the SPA.  Mot. 17.  As to whether the damages flowed from the alleged breach, PolyOne

5    argues that the SPA does not limit the indemnity obligations to those that would not have occurred

6    "but for" the failure.  Reply 10.  Additionally, PolyOne claims that Delaware case law places the

7    risk of false representations on the seller in cases such as this.  *Id.* at 11-12.

8           Shilling counters that there is a genuine dispute of material fact as to whether PolyOne

9    received the Confidentiality Agreement prior to the closing date.  Opp. 20.  According to Shilling,

10   Will Nordloh, PolyOne's finance director, testified in his deposition that he had seen the

11   Confidentiality Agreement in the data room, only to later amend this testimony on an errata sheet.

12   *Id.* at 21; Crosby Decl., Ex. J.  Shilling argues that this deposition testimony creates a dispute of a

13   material fact that defeats summary judgment.  Opp. 21.  Shilling also argues that PolyOne cannot

14   prevail because no damages were caused by the alleged non-disclosure of the Confidentiality

15   Agreement.  *Id.* at 21-22 (citing *Soterion Corp. v. Soteria Mezzanine Corp.*, No. 6158, 2012 WL

16   5378251, at *17 (Del. Ch. Oct. 31, 2012)).

17          Section 5.14(a)(viii) of the SPA required the Majority Shareholder to disclose in

18   Disclosure Schedule 5.14(a) "all of the [material] Contracts to which the Company. . . is a party"

19   and that are "Contracts concerning or restricting the ownership, licensing, sharing, transferring or

20   use of, or rights under, any. . . Intellectual Property of any other person."  SPA 31-32.  Under

21   section 5.14(b), Glasform's Majority Shareholder also had to represent and warrant that "Neither

22   the Company nor its Subsidiary is in default under any Material Contract, . . . and no event has

23   occurred that with the lapse of time or the giving of notice or both would constitute a breach or

24   default on the Company. . . . The Company has delivered to Purchaser true, correct and complete

25   copies of all of the Material Contracts, together with all amendments, modifications or

26   supplements thereto."  *Id.* at 33.

27          A claim for indemnification resulting from a breach of a representation and warranty is a

28   claim for breach of contract.  The elements of a breach of contract claim are (1) a contractual

13

United States District Court
Northern District of California

1    obligation, (2) a breach of that obligation by the defendant, and (3) resulting damage to the

2    plaintiff. *H-M Wexford LLC v. Encorp, Inc*., 832 A.2d 129, 140 (Del. Ch. 2003). "To satisfy the

3    final element, a plaintiff must show both the existence of damages provable to a reasonable

4    certainty, and that the damages flowed from the defendant's violation of the contract."

5    *eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, No. 7471, 2013 WL 5621678, at *13 (Del. Ch.

6    Sept. 30, 2013). The parties do not dispute that there is a contractual obligation so the Court

7    discusses below the other two elements – breach of that obligation and damages resulting from the

8    breach.

9             The Nordloh deposition testimony and the errata sheet do not create a dispute of material

10   fact on the issue of the breach. It is undisputed that the Confidentiality Agreement was not listed

11   on the disclosure schedule, thus establishing that there was a breach of section 5.14(a). This is

12   because section 5.14 requires material contracts to be listed in the Disclosure Schedule, and the

13   parties do not dispute that TRC's Confidentiality Agreement was a material contract not listed on

14   such schedule. Reply 8. Similarly, Shilling also does not dispute that there was no disclosure of

15   "events" that would constitute a breach in accordance with section 5.14(b). It is undisputed that

16   the Confidentiality Agreement was not made available to PolyOne in the data room. Nordloh's

17   errata sheet to correct misspoken deposition testimony is not enough evidence to raise a genuine

18   issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (holding that the

19   "mere existence of a scintilla of evidence in support of the plaintiff's position will be

20   insufficient"). As such, the Court does not find there is a dispute of material fact as to whether

21   there is a breach of sections 5.14(a) and (b).

22            However, as to the final element of the breach of contract claim, requiring that the

23   damages flowed from the breach, the Court finds no evidence that the TRC lawsuit resulted from

24   Glasforms' failure to disclose. Here, the indemnification provision set forth in section 9.2(a)(ii) is

25   narrow in scope, and only covers losses "based upon, attributable to, or resulting from the failure

26   of any of the representations or warranties in Article V." There is no evidence that the TRC

27   lawsuit was "based upon, attributable to, or resulting from" the failure of Glasforms to disclose the

28   Confidentiality Agreement to PolyOne. Further, to demonstrate that damages flow from a

14

United States District Court
Northern District of California

1   contractual breach, the standard of "proximate cause" governs and has been defined to mean that

2   "the breach have contributed materially to the non-occurrence."  *WaveDivision Holdings, LLC v.*

3   *Millennium Digital Media Sys., L.L.C.*, No. C.A. 2993-VCS, 2010 WL 3706624, at *14 (Del. Ch.

4   Sept. 17, 2010) (citing Restatement (Second) of Contracts § 245 cmt. b); *LocusPoint Networks,*

5   *LLC v. D.T.V. LLC*, No. 14-01278, 2015 WL 5043261, at *13 (N.D. Cal. Aug. 26, 2015).  It is

6   disputed whether the failure to disclose the Confidentiality Agreement contributed materially to

7   the TRC lawsuit.  Opp. 22.  PolyOne also continued to sell sucker rod bodies to FlexRod well into

8   2015 after it was on notice of the alleged breach by the filing of the TRC lawsuit.  *Id.* at 23.  This

9   is contrary to PolyOne's blanket assertion that its damages flowed from Glasforms' failure to

10  disclose.  The cases cited by PolyOne are distinguishable and do not alter the conclusion that

11  section 9.2(a)(ii) does not cover indemnification of the TRC lawsuit.  *LocusPoint*, 2015 WL

12  5043261, at *5, 6, 21 (awarding specific performance because the misrepresentation prevented

13  consummation of the sale of the company); *Cobalt Operating, LLC v. James Crystal Enterprises,*

14  *LLC*, No. 714, 2007 WL 2142926, at *1, 30-32 (Del. Ch. July 20, 2007) (granting judgment in

15  favor of the plaintiff in a post-trial opinion and allowing indemnification because the

16  indemnification provision covered all costs and expenses related to the defendant's breach of

17  contract with third parties).

18          As noted by the parties, there may be another provision in the SPA, section 9.2(a)(v), that

19  entitles PolyOne to indemnification for the TRC lawsuit, a position that Shilling also disputes.

20  Mot. 16 n.5; Opp. 24-25; Reply 13.  However, PolyOne does not request a summary judgment on

21  this issue and "acknowledges there may be genuine issues of material fact as to this question."

22  Mot. 16 n.5.  Accordingly, the Court does not address this issue at this time.

23  **IV.   ORDER**

24          For the foregoing reasons, IT IS HEREBY ORDERED:

25          (1)  PolyOne's motion for partial summary judgment is GRANTED in regard to the

26  applicability of the Cap to the obligations of the Majority Shareholder.  The Court finds that the $5

27  million Cap in section 9.4(b) of the Share Purchase Agreement does not limit the indemnity

28  obligations of the Majority Shareholder in regard to the "loss of business" indemnity claims based

on breaches of representations and warranties contained in section 5.24(b) of the SPA, or PolyOne's claim for defense and indemnity against the TRC Lawsuit based on breaches of representations and warranties contained in section 5.14(a) and (b) of the SPA.

(2)  PolyOne's motion for partial summary judgment is DENIED in regard to PolyOne's claim that Shilling is obligated to defend and indemnify PolyOne against the TRC Lawsuit under section 9.2(a)(ii).  Although there is a breach of representations and warranties under sections 5.14(a) and (b), the Court finds the evidence disputed as to whether the costs and damages associated with the TRC lawsuit resulted from such breach.

Dated: December 16, 2016

BETH LABSON FREEMAN
United States District Judge